It's a pleasure to be here again this morning. May it please the court, Charles Seville on behalf of Appellate Ziskin. This case is an interlocutory appeal on the issue of whether what I have labeled for simplicity's sake, whether the charged and convicted conspiracy of 1999 is also the truth. In this case, the trial court very seriously considered this issue twice. And I think that in doing so, the court was very concerned about whether there was one conspiracy, because the court said that the court barely believed that the government had proven two conspiracies during argument. It found that this particular interlocutory appeal was not a frivolous issue. And it said, this is a serious issue. I don't think it's clear cut. And Mr. Ziskin should have an appeal. And in doing so, under the law of the circuit of Bendis and Flick, which are cited, we cross the evidentiary rubicon from a claim, a frivolous claim, into a prima facie showing of a double jeopardy violation. This is and that means that the And why is that important? It's important in this case, because as I point out in the opening brief, the court, when the court made its rulings on the five-factor analysis and other factors, really made it based on a burden allocation, as opposed to what I would say would be the correct allocation is that the government proved two conspiracies at this point, because the defendant had crossed the burden of proof. And and so that is that was an error. And that's why we are arguing that we are going to assuming in our argument that the burden now is with the government to prove two conspiracies. This is a very unique case. When you look at other cases, oftentimes you're seeing a conspiracy. The first conspiracy is in Missouri. And then the second one is in Florida. And they're arguing, sometimes successfully, that they're one conspiracy. Here we have in 1998 and 99, the same principles. That is, in this case, my client, Mr. Tamer, Abraham and Muneer Deary. And none of those people are arrested when the government argues that the breakpoint, the fracture point between the two conspiracies is a seizure that took place in December 21st, 1999. And thus they start the second conspiracy on January 1st, 2000. And we argue that's an arbitrary bit of legal draftsmanship because none of the the agents who investigated this case and their affidavits, the investigators affidavits are all in the government's excerpts. And we go through those in the reply brief, showing that they're saying we investigate and we start investigating this conspiracy, a conspiracy in the fall of 1999 as a joint task force. They don't talk about December 1st, 21st, 1999, being this fracture point that's so significant to break it apart. In fact, as I point out, one of the one of the agents says to get into the specifics of the two conspiracies. Yes. Well, if we go through the five. Well, let me finish this point. That is, I don't understand the point you're making at all, sir. OK. The the government's OK. The government's allegation is that the this is two conspiracies separated by a big seizure on December 1999. But one of the agents in who's the best one of the investigating agents says that that seizure demonstrates the defendant's participation in the 2000 conspiracy. So the government in his brief argues that the December seizure ended the first conspiracy. One of the agents who has several affidavits in the file and we point out the reply brief says that is an example of his participation in the 2000 conspiracy. That's your point. I suggest you go into a stronger. OK. Well, we go through the five factor. Well, first of all, I want to leave. I don't want to cut you off. That's right. I want to leave the point of the burden of persuasion, because I think I think we have established that the burden is on the government to show two conspiracies and that they have failed. When you look at the five factor analysis that is used in this in this circuit and I think every other circuit, that is with respect to the time of the conspiracies, the places, the persons, the overdose and the statutes. We clearly have the same statutes involved there to 846 to 963 conspiracies to import and distribute of the same substance. You're going to get up in a few minutes and show the difference between the two conspiracies. Why don't you tell us give us the worst factual case against you before they give you and then show that that the even the worst facts show that. There was only one point out that the first shipment came in through FedEx boxes. The second one went with freight from the first one was from Holland to to the United States. The other one was about freight, freight to Korea, repack there, put in mixed with clothing, that sort of thing. That the first that the your client was a a prime mover in the first conspiracy. The second conspiracy, he didn't join it until after it was started. And he did it only to get money to pay off his other co-conspirators in the earlier proposition. Why don't you get into something like that? That's an excellent capitalization. Of what Mr. Walker will be telling you. So let me let me respond to it. This court has said in conspiracies that there can be subgroups in the government has alleged that the Korea, the four or five alleged passages of ecstasy from Europe through Korea as a Angeles area is a major difference. That shows two conspiracies. Well, the problem with that is, as as the record reflects, the defendant is a difference in the operation of the export of ecstasy to the United States. It shows this. If we depend, of course, everything is that that is a difference. It is a different fact. Yes. But but with respect to the modus of the conspiracy, what I call the single conspiracy. This question. When they started to when they started, when instead of using FedEx boxes to ship ecstasy, they sent it by air freight to Korea. Is that right? In some cases, they were still doing it to Europe, from Europe to California direct in the year 2000 as well. Now, when they were first doing this to Korea, I was your client involved in that in Korea. There's no evidence of his involvement in Korea shipments, none of which, by the way, are charged in the 2000 indictment. So. So Korea is out there. But in terms of what happened in the year 2000, if we look at the indictment, the major part of the indictment in 2000 is the July shipment. That is. And the defendant is clearly involved in that because they have him on tape in June and July, discussing with Tamer Ibram how they're going to go about that. The government also concedes that he was involved in cocaine shipments in February, in the spring of the year 2000. So when do you say that he became involved in the Korea shipment? He did not. I'm saying that Korea is a subgroup between Tamer, Ibrahim and Deary in bringing that in. That does not mean that because the defendant was not involved in those four or five shipments, none of which are alleged in the 2000 indictment, that that means that he wasn't part of the greater conspiracy that was ongoing. Just because just because some of these people went off on frolics of their own occasionally, but joined up during the 1999 2000 time period does not mean that we have two conspiracies. And so we had a subgroup is what we have for four or five unalleged in the indictment experiences. But all of those involved. Pretty soon you're going to be saying wasn't any conspiracy. I'm I'm trying to get from you. When do you say he began to participate in what the government alleges was the second conspiracy? Our argument is that there was no break in the conspiracy at all. So you understand the question. Well, you're asking me if when did the Ziskin commence involvement in the second conspiracy? No, no, no. I didn't say that. Did I? I said when did he participate in the operation which the government says was the second conspiracy? Well, I'll work back from July in June and July. They have him are June or July 2000. He's I'm difficult. I'm very difficult. I'm very slow. You know, and I have to get these little pieces of time. Could you answer my question? When does the government say that he was involved in the year 2000? When did you say he was involved in the government? This is the last question I'm going to ask. OK. Difficult communicating. May I may I respond to that? Just like that. Well, I think you're saying what does the government say his involvement was in the year 2000? I have no more questions. OK, I'm sorry. I missed I missed the point. Let me let me try to respond in this way. Forgive me, please. I will want to respond by giving you what the government says. My client's involvement wasn't. I think his question was, what do you say? When do you say your client became involved in the shipment that the government says is the second conspiracy? The government describes it that way. You're not describing it that way. But if you take the government's description that this is the second conspiracy, when did your client become involved in the shipment? Well, I can only respond with the record, which is the government's presentation of evidence. I didn't put the defense below, didn't put any evidence in. So I have the government's debriefings and the agent affidavits. What do they reflect? That's what I have to argue from the record. I can't give you a subjective statement of when did Mr. Ziskin become involved in the second. I can only go by the record. The record reflects working backward from June and July 2000. He was clearly involved in the in the effort to bring in a substantial amount of MDMA from Europe to Los Angeles. Not through Korea. That shipment went from Europe straight to Los Angeles. The government also alleges that in the year 2000, that he was involved in cocaine shipments with Deary and Ibrahim, which was part of the conspiracy from 1999 to send cocaine from the United States to Europe in exchange for MDMA. The agent affidavits state the replete and they're cited in the reply brief where I cite the agent affidavits stating Ziskin's involvement in the year 2000. Rather than me repeating those here, I would just commend the court to read the reply brief, which analyzes the agent affidavits showing Ziskin's involvement in the 2000 conspiracy. So that's the government position. And our position is that that in the burden of proof, their evidence demonstrates involvement in the 2000 conspiracy. Of course, he's involved to a new subject, which is continuing criminal enterprise. I'm with you to a point until I look at the Supreme Court case law that says the predicate offense to establish a pattern of drug violations as one of the elements for CCE can include prior conspiracy convictions for which the defendant has already been convicted. And as I understand in reading the CCE count, he is actually not charged with the conspiracy that he was convicted on, what you call the 1999 conspiracy, I guess. He's charged with the 2000 conspiracy. So why is it improper for the government to proceed to trial, at least on the CCE count, on the basis of this evidence? Because our position is that the CCE count, which is a conspiracy, if it is the same as the 1999-2000 conspiracy, then he has been convicted of the 1999-2000-846 conspiracy, which is an LIO of the CCE, as held in Rutledge. The Supreme Court case saying an 846 can be, if the facts are consistent with time, place, et cetera, that there are one conspiracy. He's been convicted of the 846 for the years 1999 and 2000. But as I understood your answers to the earlier questions, if the evidence at trial establishes that Mr. Ziskin was not involved in the Korean shipments, but the government is able to establish that there were Korean shipments in furtherance of what I'll call the CCE conspiracy, then can't the jury find that there is no double jeopardy problem with regard to Mr. Ziskin because it is, in fact, a different conspiracy? Well, I think we're back to the same question now. If 1999 and 2000 are distinct conspiracies, then we have a defense as a problem. If there are one conspiracy under 846, then 846 is an LIO of this particular charged CCE. And then I guess my other question for you is, why can't why can't we wait until the trial is completed and then let the court decide, assuming Mr. Ziskin is convicted at sentencing, to make sure that he doesn't get sentenced twice for the same offense? Well, if the CCE is an LIO, excuse me, if the 846 is an LIO, then he cannot be convicted. I know I know they're in a simultaneous prosecution of an 846 and a CCE can only be convicted of both, but can't be sentenced. But I think in this case where you have the conspiracy has already been charged, proven, and he's been sentenced, and then you're charging him with the same conspiracy, both in terms of an 846 and a CCE, that double jeopardy precludes that prosecution. And I cited the case Harvey, which says that the 846 in that case in which he was convicted precluded the CCE, which came about later. So it can happen. All of these cases are fact determinate. But I'm just going to say, it doesn't in part your answer have to be qualified, but we don't yet know at this point what the jury would find at trial with regard to what overt acts were committed, what substantive offenses were committed in determining whether or not Mr. Ziskin was involved in all of the counts of conviction. That's true. We don't know what a jury would hold. But under the five factor analysis, our position is that this should not go to a jury because of jeopardy being established by the fact that there is one conspiracy. In addition, they're not going to make any findings on Korea because there is no allegation of Korea shipments. So that issue about the subset of shipments to Korea is not going to be an issue for a jury finding. It may be evidence that Mr. Ibrahim was off on a subset of shipments with someone else. That evidence is going to come in against the other co-defendants, right? It's going to come in against the other co-defendants. It may be, who knows what's going to happen if this goes to trial with Mr. Ziskin as a participant. I'll reserve the rest of my time. Good morning. May it please the Court. My name is Jean Morbacher and I represent the United States in this case. I'll go directly to the issue of the five factor analysis test and why the government has shown that there are, there were two conspiracies here. The purpose of the factor analysis test is to determine was there one agreement or two separate agreements. The key fact here in this case that shows that there were two separate agreements is the break in the conspiracy. That occurred in December 1999. Let me back up a little bit and explain what was going on in 98-99. This is explained in the government's brief. Louis Ziskin started off an ecstasy dealing on his own. He would fly to Europe, get ecstasy, bring it back. He became more sophisticated as he earned more money doing this. He brought in partners. That's Alex Naiman, Tamer Ibrahim, who is a co-defendant in this case. These two would invest money in Ziskin's enterprise so that he could buy more ecstasy. They would also eventually travel with him to Europe and negotiate for the ecstasy, which would then be brought back. Ziskin then developed a way to bring back the ecstasy that was better than just having people smuggle it back on their person. He would have it shipped in Federal Express shipments from Europe to Los Angeles. Then Tamer Ibrahim brought in Deary, who then worked very closely with Ziskin, was basically his lieutenant on the domestic side of the operations. Deary's role was to find addresses where the FedEx shipments could be received. He would then retrieve the FedEx shipments, store them, and then distribute it to the people above him, which were Tamer Ibrahim, Ziskin, Alex Naiman. Ziskin became, again, more sophisticated when he decided, I'm going to pay for my ecstasy by sending cocaine to the ecstasy dealers in Europe. And Deary's job was to get the ecstasy, package it in FedEx, ship it across to the addresses that Ziskin would determine. This all worked well for a while until in the summer and then into the fall of 1999, the government started picking off the Federal Express shipments. As Deary explains in the report submitted by the government, some tensions started developing between Tamer Ibrahim and Ziskin. December 1999, this tension came to a head. The government intercepted three Federal Express shipments with ecstasy that Ziskin's enterprise had arranged to come in. Deary was supposed to pick it up, but another person, John Ibrahim, does. This leads law enforcement back to Deary's apartment, Tamer Ibrahim's apartment, and Alex Naiman's apartment. And the government, the agents, search all those locations. This caused or was a severe blow to Ziskin's enterprise because the searches succeeded in seizing 700 pounds of ecstasy, which had been accumulated over time through the FedEx shipments. So just because there's a blow to the enterprise doesn't mean that the conspiracy ends, does it? Not necessarily, but the government did submit evidence, and it's compelling evidence, that it in fact caused the break between Tamer Ibrahim and Deary on the one side and Ziskin on the other. Deary was interviewed, I believe it was in the spring of 2001, as to what happened after the December 1999 seizures. And he says, I stopped talking to Ziskin because we had a dispute and I didn't like what was happening. And Tamer Ibrahim, and it says right in the report, his report, took great lengths to distance himself from Ziskin. Now they maintained some contact with him because both of them felt that Ziskin owed money to Deary for some of the losses in December 1999. Deary's, so you have a conspirator there saying there was a break here and we in fact went off on our own, and we set up this whole new way of importing ecstasy using the Korea contact and making the ecstasy look like these are large shipments of legitimate merchandise. Normally the government is in here arguing that the conspiracy continues, regardless of schisms among the participants. So what's your best case authority for your proposition that a fallout among some of the conspirators ends the conspiracy? The best case on its facts is U.S. v. McCann, which is from the Fourth Circuit. There there was a conspiracy that went from, I believe it was from 1984 to 86, and then from, I'm sorry, it might be 1982 to 84, and then I believe 86 to 88. There was a break there. Now there was a longer break there, but the length of a break does not determine whether a break occurred. McCann said there was a break here and there's definitely a second conspiracy, even though, similar to this case, there were three overlapping conspirators. And what the court found compelling there is first the break, and then second the method of operation, and third the roles that the three overlapping conspirators had, that their roles changed. Those are the exact key factors that are at issue here. Talk me to the language in McCann that you're relying upon. Yes, Your Honor. While I'm looking for that case, the two other factors, method of operation, was key in McCann and is key here. The method changed here from Federal Express shipments to the Korean shipments. Since I can't do two things at once, I'll focus on McCann. Yes, let's see. I believe it's on page 139 of the opinion. Second, and perhaps most important, is showing that the 1988 activity was not simply ñ was simply not a mutation of that began in 1984, according to both Posey and Cunningham, who were cooperators in that case, just like Dewey. And what's this case we're talking about? This is U.S. v. McCann, which is a Fourth Circuit case, 966 S. 2nd 134. The hiatus between 86 and 88 was not merely a lull in the activities of the conspiracy, but constituted a true break. So we have here, just like in McCann, a conspirator saying there was a break. We broke away from ZISCN and set up our own operation. That's McCann talking about a break in the activities of the organization, not a break among the participants. True, but I think that can be analogized to there's not a lull here. What we have is from one large enterprise, ZISCN's enterprise, part of that group breaks away to set up their own enterprise. There's a lull, then, in the activity between ZISCN working with Ibrahim and Dewey. But he does come back in, then, for that final shipment in July 2000. And I do want to address one of the questions the Court has, was ZISCN involved with any of the prior Korean shipments? Dewey says no. He is corroborated by the reports of interview by two other co-operators, Joseph Gilboa and Mr. Ji Haru. Joseph Gilboa was responsible for putting the FCC together in Europe, getting it to the shipping company so it could go to Korea. He never mentions ZISCN. He doesn't appear to know who ZISCN is. Ji Haru is, then, the Korean connect. He doesn't appear to know anything about ZISCN, indicating that ZISCN had no involvement setting up the Korean shipments. That's further corroborated by the calls that the government summarized in its facts, where in June, Tamer and, excuse me, Ibrahim and ZISCN are talking about ZISCN trying to get some of his ecstasy brought across. And ZISCN says, you know, why don't you put that stuff in the air? Meaning, why don't you do it FedEx? And Ibrahim says, no, no, it's on my side. I'll deal with it. Meaning, I've got my own operations. You don't tell me how to do it, and I'll take care of it. So that points, just like McCann, how the methods of operation are significantly different. Also, Deary says that he had heard through others that ZISCN was conducting his own importation of ecstasy in 2000 through other methods that neither he nor Ibrahim were involved in. The other key difference that McCann found and that is true here and that the district court found here is that there are differences in roles. ZISCN started up his own business, and he brought Tamer Ibrahim under him and Deary under him. Ibrahim was an investor and would travel with ZISCN. Deary was basically a lieutenant to ZISCN and would run around finding the addresses for the FedEx shipments. Ibrahim, all three of their roles changed significantly. When Ibrahim sets up his own enterprise, Ibrahim is now the top dog. And the district court found that compelling. She put it in footnotes saying no longer was he below ZISCN but had started his own and was at the top of his own organization. And Deary explains in his report that no longer did Ibrahim have to rely on ZISCN to negotiate with a supplier in Europe. Ibrahim in 2000 was negotiating directly with, I believe it's Hugo, for his own ecstasy. That's a significant difference. Deary's role changes as well. No longer is he simply trying to find some addresses where the FedEx shipments can be received and picking it up. He's working intimately with Ibrahim, not working intimately with ZISCN like he used to, in helping to figure out this new Korean system, how to pick it up, how to store it, etc. Now, the final role that's very different is ZISCN's role. In ZISCN's enterprise, he was the top player. He was directing Ibrahim and Deary and was relying on the Federal Express shipments. In Ibrahim's enterprise, he has no role. He has no particular role aside from, can you please bring some of my own ecstasy across? He didn't organize the new Korean way of shipping. He wasn't telling Deary what to do, and that's pretty clear from the calls that the government provided in its brief. So not only is the government saying, look, law enforcement caused a break, but we have a conspirator saying that break did occur and it's corroborated by several facts which I've explained. Weren't there some evidence that he got involved in this new operation because he wanted to make money to pay off some of his other co-conspirators to whom he was indebted? He being ZISCN? Yes. Yes, that's correct. But that fact alone is not particularly compelling because I believe it's in Guzman, the defendant also claimed, where there was a rather short break between the two conspiracies there, I think it was only two to three months, also claimed, well, I got involved again with some of my conspirators, again in cocaine, to pay off a prior debt. And Guzman said that's not compelling. There may be some interrelationship, and it makes sense that there might be some interrelationship, and this was an ongoing dispute with ZISCN that he owed money to Deary. I do want to touch, in mentioning Guzman, the Court had asked what's my best case. The point that I thought was significant that they had made, but apparently I missed it, the government's theory that the first conspiracy he was a principal, if not the real top dog, and the second conspiracy, was it Ibrahim? Ibrahim. And that he got into it later on after that, quote, second conspiracy started, and he had reasons other than running it himself. Yes, I think I understand what the Court is saying, is that like the district court found, Ibrahim had a lower position in the ZISCN enterprise and decided, I'm going to, in a sense, almost compete with Mr. ZISCN. I'm going to set up my own company, and I'm going to take some of the people from the company I've been in and set up my own operations. The Court did ask what's my best case. McCann is very good. Guzman is also very good, because it also has overlapping conspirators, and it found the different roles very important in indicating two conspiracies. It did look at the means, even though there was an overlap in place, such as California and Florida, it didn't find that that was determinative. And I do want to say one thing about the five-factor analysis test. It is the test here, but it's not something that should just be used as a recipe. It's to really get at what is going on. Are there two separate conspiracies? I do want to touch on the legal standard of clearly aired. The defendant would have this Court take Vendis for its two most important rulings and overrule it. The two important rulings in Vendis are, one, the Court reviews the legal provisions under de novo review. That's correct. But reviews the district court's finding for clearly erroneous air. Excuse me. It applies the clearly erroneous standard. The defendant would have the Court basically conduct its own review all over again. The second point is Vendis says, okay, the defendant needs to make a prima facie showing. And then it shifts to the government to tender proof. And that may end up being a burden of persuasion. But Vendis specifically said, we know that I believe it's the second, fourth, and fifth circuits require the government to then prove by preponderance of the evidence. But Vendis specifically did not adopt the preponderance of the evidence standard. It went on to say, you've got a Tenderson proof, it may end up being persuasion. And in the end, Vendis said, we find that the evidence suggests that there are two conspiracies. In other words, the government needs to put forward some evidence that suggests there are two conspiracies. U.S. v. Montgomery is another interesting case out of the Ninth Circuit. That was post-trial. But it went on to give a more specific standard of let's apply the sufficiency of the evidence test. Looking at all the evidence most favorable to the government, could a rational, one rational juror find that there were two conspiracies? And that's where we would be after trial. True. But that's clearly not where we are in a locatory. No. But I believe that standard would be appropriate here, because basically what the district court and this court has to do is say, we think this is what the evidence is. The evidence will continue to evolve. The evidence has not been tested by cross-examination.  And we have another problem, too, don't we? I mean, Mr. Sevilla is asking us to make this determination on the basis of your DEA-6s and FBI-302s and nothing from the defense in terms of what their answer to any of these allegations might be. That's correct. And I think it's very difficult, and it seems to me, for an appellate court to look at this record and make any kind of a conclusive, factual determination, even if we were inclined to second-guess the district court. Right. And I think that's why the district court's finding should be given factual – should be given definite. She reviewed the facts twice. And despite what counsel says, counsel wants to say, hey, we made our prima facie showing, and that's all we needed to do, and the district court focused – made a wrong decision to that. The issue of whether or not the court didn't do the shifting of burden properly is moot, because the government came forward with quite a bit of evidence, multiple reports of interview, the indictment from the prior case, the trial memo from the prior case. And then the court didn't just look at the defendant's case and say, he hasn't made a prima facie showing. She went on and looked at the government's evidence, and she evaluated. And four out of six factors, she said that the government's evidence was persuasive. That's as to methods, the roles, the locations, and there's a fourth factor, and the open acts were different. So regardless of what defendant says as to whether or not the court did the shift properly, she went on and analyzed the evidence. And she analyzed it to a sufficient degree that this court can rely on her findings, that they weren't clearly erroneous. The court may not be able at this point to say definitively there are two conspiracies, but there's enough there to suggest that there are two. I do want to touch on a point brought up by defendant. He keeps saying, but, you know, there's no evidence of these prior Korean shipments, because it's not charged in the indictment. Well, under Guzman, the court is not bound to only look at the indictments. If that were the case, the government, the court should ignore all the reports that the government submitted. The court is allowed to look at the evidence. And Gilboa very carefully explains that there were multiple shipments done in 2000 with the new program, and that many of them, nearly all of them, went through Korea. And I believe he explains that the last one that was seized, nobody knows why it didn't go through Korea. It appears that maybe the shipping company on its own decided, well, we're just going to send it straight to the United States. So the court does not have to only look at the indictment to decide what shipments are at issue. And those prior shipments indicate no involvement by the defendant. Just to go back a little bit on the issue of why the court should only use the clearly erroneous standard, Bendis does explain why it's appropriate here in the interlocutory appeal stage. And it's, as the court touched on, that the court really can't engage in a plenary review, as the court was able to in Guido. Guido is the case that defense urges this court to follow, because we don't have the second trial. We don't have the second trial transcript where the court can do a complete comparison of the facts. Given that, the government has tendered evidence that the district court was at least persuaded that the evidence suggests two conspiracies, that should be enough for the government to go forward and try the defendant. The defense will be free to bring the motion again after all the evidence is fully developed, and then this court will have a full record upon which to conduct its review. Does the court have any other questions? I don't think so. Thank you very much. Should the court not agree to hold that the five factors compellingly demonstrate that there is one conspiracy? I would ask the court to do this, then, in the alternative. It's clear that the defendant met the bendis hyphen flick standard of prima facie case, because the evidence is there, and the court's comments were such that, as the court said, it was a close case, it was barely sufficient that the government showed two conspiracies, that it was a non-frivolous showing, and she certified it to this court for review, saying that it was a very serious issue. If one looks, then, at the court's findings, the court's findings were determined by not requiring the government to prove, based on the factor analysis, that there were two conspiracies. If one looks, and I laid this out in a brief, as to why look at the court's order, the determination was... How do you define prove? Aren't we really talking about, as Ms. Mohrbacher urged, the burden of persuasion? And we have, I think, been careful in some of these cases that she was talking about, not to go so far as to say we're going to hold a mini-trial and render findings of fact and conclusions of law. Correct. But I think if one looks at the court's order in ER-201, on the factor analysis, the court was persuaded by the burden of persuasion is what caused the court to find the factors as insufficiently demonstrating two conspiracies. And it was... And our position is that given the court's finding a close case and non-frivolous showing, in resolving those five-factor analysis, the court should have said, okay, it's the government's burden to persuade me. Call it burden of proof, burden of persuasion. It's their burden to show me that there are two conspiracies with respect to the issues of time, place, locus, statutes, and overt acts. And it's very clear, when one looks at her order, that these are determined not by so much proof that she would say, for example, on time. It simply can't be determined on the basis of the record before the court that the time lapse is such as to create two or one conspiracy. So if we take those factors, not as a recipe to make the double jeopardy determination, but as a guide, she still comes out at the end of her order in saying, I'm satisfied based on the showing that the government has made that there could be two conspiracies here. And I'm going to allow you to renew your objection, presumably, I guess, on what, a Rule 29 motion at the close of the government's case in chief. You know, you're not being prejudiced to that extent in that you can renew the motion. Isn't that tantamount to her saying, I am persuaded at this point that there's enough here to force the defendant to trial? The court's order was certainly demonstrative that she concluded that there were sufficient evidence of two conspiracies under what we call the misallocation of the burden of persuasion. So I would ask the court this, that in a remand, because I think it's clear that there was error under Bendis and Flick in the allocation of the burden, that the court instruct the judge to revisit this issue. Well, she says she will. With a proper allocation of the burden of persuasion, that if the court finds a prima facie showing of one conspiracy, that the burden of persuasion should be on the government on the resolution of the five factors. To extend the law, you want us to go where no panel of this court has gone before, which is to say she must, in essence, hold a hearing at which she must make findings of fact based on the proffer by the government that there are two conspiracies. That's what I hear you saying. I'm asking that the court make the same decision that it made below with an understanding that under Bendis and Flick, that the defendant has crossed the evidentiary rubicon of showing a prima facie non-frivolous showing, and given that, the burden of persuasion in resolving those five factors is on the government. That's all we would ask. That is Bendis. That is Flick. Flick reversed. Flick is a reversal. The government cited Flick. It's a great case for the implementation of Bendis. Flick reversed because the court said, okay, there may be a prima facie case here, but the case is insufficient to show that it was one conspiracy. And this court reversed, saying, no, you've got to do better than that. You have to apply the burden of persuasion. If you find it's a prima facie showing, then the burden of persuasion is on the government. And that's what we'd ask. Thank you very much. I want to thank both counsel. The case was very well argued. And I think we'll take a recess for about ten minutes.
judges: Aldisert , Tallman, Rawlinson